|  |  |  |
|---|---|---|
| JASPER ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:06-CV-96 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| BUZZI UNICEM USA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **M E M O R A N D U M**

On March 10, 2006 plaintiff Jasper Ellis ("Plaintiff") filed a complaint in the Chancery Court

for Hamilton County, Tennessee, against defendants Buzzi Unicem USA ("Buzzi" or "Defendant"),

General Portland Inc. Pension Plan, the Administrator of the General Portland Inc. Pension Plan,

Pension Plan for Hourly Compensated Employees of Signal Mountain Cement Company, L.P., 2000

Restatement, and the Administrator of the Pension Plan for Hourly Compensated Employees of

Signal Mountain Cement Company, L.P. (collectively, "Defendants")[1] (Court File No. 1-3).  On

April 21, 2006, the matter was removed to this Court (Court File No. 1) under the Court's diversity

and original jurisdiction.[2]  The complaint alleges one claim for retaliatory discharge arising from

Plaintiff's exercise of his workers compensation rights, and a second claim for intentional infliction

of emotional distress (Court File No. 1-3).

---

[1] It appears the docket sheet omits as a defendant the "Pension Plan for Hourly Compensated Employees of Signal Mountain Cement Company, L.P., 2000 Restatement."  As the Plaintiff agrees this defendant should be dismissed, this omission is unimportant.

[2] 28 U.S.C. §§ 1332 and 1441(a) & (b).

Before the Court is a motion to dismiss and for summary judgment (Court File No. 12) filed by Defendants on March 13, 2007. Plaintiff timely responded (Court File No. 15) and Defendants replied (Court File No. 20). This motion is now ripe for review. In his response to the motion to dismiss, Plaintiff agreed all Defendants except for Buzzi should be dismissed from this matter (Court File No. 15, p. 25). Therefore, General Portland Inc. Pension Plan and the Pension Plan for Hourly Compensated Employees of Signal Mountain Cement Company, L.P., 2000 Restatement, and the Administrators of each respective plan, will be **DISMISSED** for failure to state a claim. Fed. R. Civ. P. 12(b)(6). For the following reasons, summary judgment will be **GRANTED** in favor of Buzzi on the claims against it. This Court will **GRANT** Defendants' motion (Court File No. 12).

I.     **BACKGROUND**

Plaintiff is a Tennessee citizen and member of United Steel Workers of America, Local No. 9-1, f/k/a United Cement, Lime, and Gypsum Workers International Union, Local No. 1 ("Union") (Court File No. 1-3, ¶ 7; Court File No. 15, p. 6). Buzzi is a Delaware corporation in the cement manufacturing business with a facility in Chattanooga (Court File No. 13, ¶ II.1).

Plaintiff worked for Buzzi for over 20 years (Court File No. 15, p. 2). On March 16, 2004, Plaintiff sustained a job-related injury, a hernia (Court File No. 1-3, ¶¶ 1-8; Court File No. 15, p. 2). Plaintiff allegedly reported the injury to his foreman, who allegedly failed to prepare an injury report, and then reported the injury to his personal doctor. Plaintiff then reported the injury to his safety supervisor, who prepared a report and sent Plaintiff to several "company" doctors (Court File No. 15, p. 2). Plaintiff was finally treated by Dr. Zellender, who performed surgery and permitted Plaintiff to return to work with no restrictions (*id.* at 3). Buzzi allegedly required Plaintiff to obtain

a second opinion (*id*.).[3]  On October 27, 2004, Dr. Barnett (apparently Plaintiff's treating physician) released Plaintiff back to work, subject to a permanent 40-pound lifting restriction (Court File No. 12-3, p. 5).

Under the Collective Bargaining Agreement ("CBA") between Buzzi and the Union, which governed Plaintiff's employment, his seniority permitted Plaintiff to "bump" into a job which could accommodate his lifting restriction (Court File No. 1-3, ¶ 10).  However, Buzzi allegedly refused to provide a list of jobs for which Plaintiff was qualified, and then "proceeded to place un-necessary lifting restrictions on all jobs that should have been available to Plaintiff Ellis, those restrictions not having been in place before" he requested accommodation (*id*. at ¶ 14; Court File No. 15-3, p.7). Defendant counters that, in 2002-03, Buzzi hired an independent consultant to develop descriptions for union jobs at the Chattanooga facility (Court File No. 13, ¶ 3).  The consultant prepared a job description for the Mechanical Maintenance II/welder repairman position (Plaintiff's position when he was injured) which required an ability to lift and carry up to 100 pounds (*id*. at ¶¶ 3-4).  Plaintiff's permanent 40-pound restriction did not satisfy the job description for welder repairman or any other union position for which he was qualified (*id*. at ¶¶ 6-7).  In fact, all position categories at the facility – except one, which was filled by employees more senior than Plaintiff – have lifting requirements of at least 75 pounds (*id*. at ¶ 11).[4]

_____

[3] Plaintiff claims "Buzzi conveniently elected to adopt Dr. Barnett's finding, even though Plaintiff felt he could do his previous job and even though Dr. Zellender's assessment was more accurate. . . . [as was] confirmed when Plaintiff was evaluated by a subsequent physician who determined that he did not need to have any restrictions" (Court File No. 15-3, p. 2).  However, Plaintiff has not submitted the affidavit of any doctor.

[4] From the Court's review, it appears there are several categories (*e.g.*, Bulk Loader, Vacuum Truck Operator, Pay Loader Plant, *see* Court File No. 12-4, p. 18-26) with lower lifting requirements, but the Court assumes Plaintiff is not qualified for these positions either by training

Plaintiff claims to have been informed by Larry Miller ("Miller"), president of the Union, that Buzzi would permit Plaintiff to retire on disability if he waived his right to file suit for workers compensation benefits. However, Plaintiff refused to waive his right (Court File No. 1-3, ¶¶ 12-13; Court File No. 15, p. 4; Court File No. 15-3, p. 8). Plaintiff was told by Miller that Plaintiff would be terminated if he did not agree (Court File No. 15, p. 4). Despite this threat, on January 27, 2005, Plaintiff filed a lawsuit in state court under the Tennessee Workers' Compensation Act (*id*.).

Plaintiff's lifting restriction precluded him from every job available in his bargaining unit (*id*. at 3-4; Court File No. 13, p. 3). Plaintiff applied for disability retirement benefits; his application was denied. Plaintiff received a letter dated March 10, 2005 which notified him that he was fired effective February 28, 2005 (Court File No. 1-3, ¶ 15).[5] Plaintiff then filed this suit, asserting two causes of action: (1) retaliatory discharge from exercise of his workers' compensation rights and (2) intentional infliction of emotional distress (*id*. at ¶¶ 18-19).

Defendant admits that Plaintiff applied for disability retirement benefits which were denied, Plaintiff's employment was "terminated," and Plaintiff/Plaintiff's Union filed a grievance under the CBA (Court File No. 12-3, p. 26; Court File No. 13, ¶¶ 8-10). An arbitration hearing was held on March 15, 2006 (Court File No. 13, ¶ 11). The arbitrator's decision upheld the denial of Plaintiff's

_____

or seniority.

[5] Plaintiff alleges Buzzi interfered with Plaintiff's disability retirement benefits, but this claim is being arbitrated and Plaintiff specifically states "THIS ACTION IS NOT INTENDED TO INTRUDE INTO THAT ARBITRATION PROCEDURE." (Court File No. 1-3, ¶ 6.) For this reason, the Court does not address Defendant's ERISA-preemption arguments (Court File No. 13, p. 7), because Plaintiff disclaims any causes of action related to an employee benefits plan. (*See also* Court File No. 15, p. 19-20) ("Plaintiff is not seeking to recover anything that he could recover under an ERISA claim and therefore his rights under the worker's compensation laws. . .are independent.")

disability claim. The arbitrator concurred that there were no union jobs to which Plaintiff's seniority allowed him to bump (*id*. at ¶ 12). Notably, Plaintiff's status was converted to "layoff" rather than full "termination" under the CBA (Court File No. 12-4, p. 63).[6]

Plaintiff notes, the parties to arbitration were (1) Buzzi and (2) the Union (Court File No. 15, p. 9-14). Plaintiff's version of the facts (*see* Court File No. 15) argues, though lifting restrictions might have been formally in place prior to his injury, such restrictions were not enforced until his case (*id*. at 4). Plaintiff claims "prior to his termination, Buzzi did not adhere to or apply the lifting requirements in its job description and, in fact, encouraged all employees to obtain assistance in lifting loads" (*id*.). Miller's affidavit states, prior to Plaintiff's injury, he "had never been provided with Buzzi's written job description that had lifting requirements that exceeded Ellis' restriction, although if they truly existed that would be something one would expect the Union to receive." (Court File No. 15-3, p. 7.) Moreover, Plaintiff asserts, even if job descriptions were developed in 2002-03 Buzzi "never checked" to see if the consultant's descriptions matched the actual work, i.e. if the employees could do or were actually doing the work as described (*id*. at 5). Citing the deposition of George Garcia, Buzzi's Vice President of Manufacturing ("Garcia"), Plaintiff claims (1) Buzzi is unaware if its employees are actually qualified for the positions in which they are employed when compared to the written job descriptions, and (2) Buzzi is unaware if any employee "has ever been disqualified or terminated for the inability to perform his or her job based upon the

---

[6] *See* Court File No. 12-4, p. 61-62:
Plaintiff was impermissibly "terminated" because "an employee can lose seniority [under the CBA] for only three reasons . . . Not any of those situations occurred in the Instant Grievance. When it was determinated that Grievant Ellis could not bump into the truck driver position because he did not have sufficient seniority to bump into such position, he should have been placed on layoff status simply because there was no basis in the [CBA] to properly terminate his employment.

written job descriptions" (*id.*) (citing Court File No. 15-3, p. 14, lines 2-7).

Finally, Plaintiff offers evidence which he believes will demonstrate Buzzi's safety policy discourages employees from attempting to lift too much (his affidavit, Miller's affidavit, and Garcia's deposition).[7]  Plaintiff argues that his lifting restriction is, as a practical matter, irrelevant to his job performance (*id.* at 4-5).  Plaintiff alleges that "Buzzi had other employees with lifting restrictions working in jobs with descriptions that included written lifting requirements that exceeded their restrictions" (*id.* at 8).  Buzzi contests this in its reply (Court File No. 20).

## II.    LEGAL STANDARD

Defendant moves for summary judgment on the claims against it under Fed. R. Civ. P. 56 (Court File No. 12, p. 1).  Summary judgment is proper where "the pleadings, depositions, answers

---

[7] *See*, *e.g.*, Court File No. 15, p. 5-7 (citing Court File Nos. 15-2 & 3, affidavits of Plaintiff and Miller, testimony of Miller, depositions of Plaintiff and Garcia) (internal citations omitted):

> [M]any of the lifting requirements violated Buzzi's workplace rules.  Buzzi had a general edict that employees should not lift heavy loads by themselves, but rather, should ask another employee for assistance.  As a result, if an employee was caught lifting over a certain weight he or she would be cited for a safety violation.  As a general rule, employees were told to ask for assistance with anything over 50 pounds. . . .  With respect to Plaintiff's position, although the job description says that an employee must be able to lift and carry up to 100 pounds, Garcia acknowledged that this is not truly a requirement:

> Q: Let's go to mechanical maintenance number two.  And it says that the individual in order to do his job, his physical requirements must in extreme temperatures lift and carry up to a hundred pounds.  Do you know of anybody that works for your company that in extreme temperatures you would ask by themselves to lift and carry up to a hundred pounds?  A: No.

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden rests on the movant to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court must view the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). It is the Court's duty to determine if the non-movant has presented sufficient evidence to raise issues of fact; however, the Court does not weigh evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

At the same time, the purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 (advis. comm. notes) (1963). The movant must demonstrate the absence of a genuine issue of material fact, but the non-movant is not entitled to a trial solely on the basis of its allegations. The non-movant must submit significant probative evidence to support its claim. *Celotex*, 477 U.S. 317, 324 (1986). A scintilla of evidence is not enough; the non-movant must present evidence sufficient for a jury to reasonably find for its side. *Liberty Lobby*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The movant is entitled to summary judgment if the non-movant fails to make a satisfactory showing on an essential element of its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. It is the Court's role to decide if a fair-minded jury could return a verdict for the non-moving party, or if "the evidence . . . is so one-sided that one party must prevail as a

matter of law." *Liberty Lobby*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.    ANALYSIS

### A.    ISSUE PRECLUSION FROM THE ARBITRATION PROCEEDING

Defendant asserts that Plaintiff is precluded from litigating his retaliatory discharge claim because "each and every fact that Plaintiff alleges and relies on in the instant lawsuit has already been argued before, considered by, and decided upon by the arbitrator" (Court File No. 13, p. 5).[8] However, Defendant fails to argue the essential, underlying issues decided upon, as a necessary part of the arbitrator's decision, were the same, and that is the basis four-part test for issue preclusion:

(1) The *issue* precluded must be the same issue involved in the prior proceeding;
(2) The *issue* must actually have been litigated in the prior proceeding;
(3) Determination of the *issue* must have been a critical and necessary part of the decision in the prior proceeding; and
(4) The prior forum must have provided the party against whom [preclusion] is asserted a full and fair opportunity to litigate the *issue*.

*Cent. Transp. v. Four Phase Sys., Inc.*, 936 F.2d 256, 259 (6th Cir. 1991) (citing *N.L.R.B. v. Master Slack and/or Master Trousers Corp.*, 773 F.2d 77, 81 (6th Cir. 1985)).  In *Central Transportation*, the United States Court of Appeals for the Sixth Circuit affirmed summary judgment on several claims because "underlying facts, essential to each claim, were litigated at arbitration. " *Id*. at 261.

_____

[8] Defendant uses the term "collateral estoppel" in its memorandum (Court File No. 13, p. 4-5).  In *Migra v. Warren City School District Board of Education*, 465 U.S. 75 (1984), the United States Supreme Court noted there has been a great deal of confusion and convolution between the terms "collateral estoppel" and "*res judicata*."  *Id*. at 77 n.1.  The Court expressed a preference for the precise terms "issue preclusion" and "claim preclusion."  *Id*.  Similarly, the Sixth Circuit has also expressed hope "future litigants, in the interests of precision and clarity, will formulate arguments which refer solely to issue or claim preclusion and which refrain from using the predecessors of those terms, whose meanings have become so convoluted."  *Heyliger v. State Univ. and Comm. College Sys. of Tenn.*, 126 F.3d 849, 852 (6th Cir. 1997) (citing *Barnes v. McDowell*, 848 F.2d 725, 728 n.5 (6th Cir. 1988)).  Therefore, this Court will use the term "issue preclusion."

But *Central Transportation* is clearly distinguishable from this case. There, essentially the same claims were arbitrated and alleged in litigation; the claims were not decided by the arbitrator, but the factual predicates were found. *Id.* Here, the issues arbitrated by Defendants and the Union[9] rest on different factual predicates than Plaintiff's state-law retaliatory discharge claim (Court File No. 12-4, p. 54). With retaliatory discharge, as discussed below, Defendant's intent in terminating Plaintiff is the main issue, and the evidence submitted goes to this point. In arbitration, interpreting the intent of the CBA and the parties' resultant conduct was the main issue (*see* Court File No. 12-4; Court File No. 15-4 (excerpts from arbitration transcript)). The Court finds the doctrine of issue preclusion does not bar Plaintiff from asserting his state-law based claims.[10] *See Wright v. Universal*

---

[9] Plaintiff was the "grievant" in the arbitration, but he was not a party to it. The Union is not a party to the lawsuit. Plaintiff argues persuasively, although he may be in privity with the Union, his interests were only some of the considerations at arbitration (Court File No. 15, p. 12-13). The Union may have been concerned with Union-Buzzi relations and with a precedential interpretation of the CBA. Further, there evidence does not show the arbitrator was even aware of Plaintiff's workers compensation claim – the arbitration decision defines the issues as whether Defendants acted in accordance with the CBA when they (1) denied Plaintiff's application for disability benefits and (2) terminated Plaintiff. (Court File No. 12-4.)

[10] As Defendant points out,

> Specifically, the arbitrator determined that although Plaintiff could not perform any of the union jobs to which his seniority would allow him to "bump," the Company had correctly denied his application for disability retirement benefits. Further, the arbitrator determined that Plaintiff was properly on layoff status.

(Court File No. 13, p. 5.) Defendant argues Plaintiff's retaliation claim is meritless because the arbitrator found Buzzi acted within its rights by denying Plaintiff disability. However, because the arbitrator found Defendant's conduct permissible under the CBA does not mean its conduct was permissible as a matter of state law, given the important public policy interest in protecting workers compensation rights. *See Barrentine v. Ark.-Best Freight Sys.*, 450 U.S. 728, 743 (1981) (arbitrator's task is "limited to construing the meaning of the [CBA]" and not a "general authority to invoke public laws that conflict with the bargain between the parties"); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 412-13 (1988):

*Mar. Serv. Corp.*, 525 U.S. 70, 79, 82 (1998) (finding discrimination claim separate from contract-based claims which had to be arbitrated); *Barrentine v. Ark.-Best Freight Sys.*, 450 U.S. 728, 743 (1981) ("even when the union has fairly and fully presented [in arbitration] the employee's wage claim, the employee's statutory rights might still not be adequately protected"); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 50 (1974) ("The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.").

## B.   LMRA PREEMPTION

Defendant argues that Plaintiff's claims are preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA"). Defendant cites *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399 (1988), for the proposition

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles – necessarily uniform throughout the Nation – must be employed to resolve the dispute.

*Id*. at 405-06. Defendant claims the Court will need to interpret the CBA to resolve Plaintiff's claim for retaliatory discharge, in order to determine Buzzi's handling of Plaintiff's claim for workers compensation rights, his application for disability, the CBA rules related to bumping and layoff or

---

[T]he relevant point for § 301 preemption analysis that the mere fact that a broad contractual protection against . . . retaliatory . . . discharge may provide a remedy for conduct that co-incidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract. For even if an arbitrator should conclude that the contract does not prohibit a particular discriminatory or retaliatory discharge, that conclusion might or might not be consistent with a proper interpretation of state law.

termination of employees, "etc., etc." (Court File No.13, p. 5-6). "Succinctly, there is no way that the Court can evaluate Plaintiff's claims without evaluating the meaning of the [CBA]" (*id*. at 7). The Court disagrees.

Section 301 of the LMRA establishes federal jurisdiction over claims which require judicial interpretation of a CBA. 29 U.S.C. § 185(c); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403 (1988) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985)); *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957) (LMRA authorizes federal courts to fashion a body of federal law for interpreting/enforcing CBAs). In *Lingle*, the plaintiff claimed she was terminated because she exercised her right under the state's Workers Compensation Act. She filed two actions, (1) a union grievance claiming she was not discharged for "just cause" as defined in the CBA, and (2) a state- law retaliatory discharge claim against her employer. The United States Supreme Court refused to find § 301 of the LMRA preempted the plaintiff's retaliatory discharge claim. *Id*. at 407. The Court analyzed the plaintiff's claim and noted its elements included a showing of employment, discharge, and motive; the Court held that establishing these elements did not necessitate interpretation of the CBA. The Court acknowledged the employer's defense – a non-retaliatory reason it fired the plaintiff – might involve consideration of the same/similar facts to the plaintiff's union grievance. However, the Court declined to find this overlap rendered the retaliatory discharge analysis dependent upon interpretation of the CBA or resolution of the grievance. *Id*. at 407. Instead the Court found the employer's defense involved a factual inquiry into its conduct and motive and not an interpretation of any provision of the CBA. The Court reasoned that § 301 did not preempt substantive rights a state may provide (statutory or common law) to workers when adjudication of those rights does not depend upon the interpretation the CBA. *Id*. at 410 ("even if

dispute resolution pursuant to a [CBA], on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 preemption purposes").

The Sixth Circuit adopted *Lingle* in *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1330 (6th Cir. 1989) (holding state law is preempted by § 301 of the LMRA only if, to resolve the claim, the Court must interpret a CBA), and has added a second step to the analysis:

> First, the district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms. Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law.

*DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994); *see also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994). If a plaintiff can prove all the elements of his state-law claim without interpretation of the CBA, the claim is independent and not preempted. However, if neither or only one prong of the test is satisfied, § 301 preemption is triggered. *Id.*; *Proffitt v. Int'l Paper Co.*, 165 F.3d 28 (6th Cir. 1998).

Here, Plaintiff's claim for retaliatory discharge due to his filing of a workers compensation lawsuit (discussed below) entails elements similar to those under Illinois law which the Supreme Court analyzed in *Lingle*, 486 U.S. at 407. The primary issue Plaintiff must address, and which Defendant may have to rebut, was Defendant's motivation in terminating Plaintiff. This inquiry is a "purely factual question[] pertain[ing] to the conduct of the employee and the conduct and motivation of the employer" and does not require this Court to interpret any term of the Buzzi-Union CBA. *Id.*; *see also O'Shea v. The Detroit News*, 887 F.2d 683, 687 (6th Cir. 1989) (state law constructive discharge and intentional infliction of emotional distress claims not preempted);

*Valinski v. Edison*, 197 F. App'x 403, 412 (6th Cir. 2006). As for *DeCoe's* second prong, the retaliatory discharge cause of action was extrapolated from the Workers' Compensation Law in 1984 and reaffirmed most clearly by the Tennessee Supreme Court in 1992. 1 Tenn. Juris., Workers Comp., § VI.1.1; *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 444-45 (Tenn. 1984); *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993).[11] The right to sue stems from the Workers' Compensation Law, which imposes a duty on employers to compensate employees for work-related injuries. *Id*. The law also creates a right for employees to receive such compensation, and the cause of action is necessary to protect this right. 1 Tenn. Juris. § VI.1.1; *Clanton*, 677 S.W.2d at 444-45. In short, the right claimed by Plaintiff is a creature of Tennessee law and does

---

[11] In *James v. Holiday Retirement Corp.*, Case No. 1:04-CV-185, this Court gave a brief overview of the retaliatory discharge claim's history:

> The Tennessee Workers' Compensation Law was adopted by the state general assembly in 1919. No provision of this law explicitly creates a retaliatory discharge cause of action nor does any provision even so much as specifically prohibit employers from terminating employees based on the filing of a workers' compensation claim. Tenn. Code Ann. § 50-6-114 does, however, provide "[n]o contract or agreement, written or implied, or rule, regulation, or other device, shall in any manner operate to relieve any employer, in whole or in part, of any obligation created by this chapter except as herein provided." In 1984, the Tennessee Supreme Court relied upon this provision in recognizing a workers' compensation retaliatory discharge claim. *See Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 444-45 (Tenn. 1984). Specifically, the court concluded the threat of retaliatory discharge was a "device" which "completely circumvent[s]" the legislative scheme reflected in the Workers' Compensation Law and a retaliatory discharge cause of action was necessary to enforce the employer's duty to compensate employees for work-related injuries, to secure employees' rights to receive such compensation, and "to carry out the intention of the legislature." *Id*. Two years later, the Tennessee Supreme Court characterized a claim for retaliatory discharge as a "separate and independent tort rather than a worker's compensation claim," and, therefore, held such claims were not directly appealable to the Tennessee Supreme Court under Tenn. Code Ann. § 50-6-225(e). *Van Cleave v. McKee Baking Co.*, 712 S.W.2d 94, 95 (Tenn. 1986).

(Court File No. 16, p. 5-6.)

not arise from the CBA.  *DeCoe*, 32 F.3d at 216.


### C.    RETALIATORY DISCHARGE

####     1.    Plaintiff's *Prima Facie* Case

There are four elements required to make a *prima facie* case for retaliatory discharge due to the exercise of workers compensation rights:

> (1) Plaintiff was an employee of the Defendant's at the time of the injury;
> (2) Plaintiff made a claim against Defendant/employer for workers compensation benefits;
> (3) Defendant/employer terminated Plaintiff's employment; and
> (4) Plaintiff's workers compensation claim was a substantial factor in Defendant/employer's decision to terminate Plaintiff.

*Anderson*, 857 S.W.2d at 558.  If Plaintiff meets his initial burden under (4), the burden shifts to Defendant to offer a legitimate, non-pretextual, non-retaliatory reason for Plaintiff's termination. *Id*. at 559.  This reason "may involve the employee's short-comings, such as unexplained tardiness, excessive absenteeism, lying as to previous compensation claims, or physical inability to do the job." *Johnson v. Cargill, Inc.*, 984 S.W.2d 233, 234 (Tenn. Ct. App. 1998) (citing *Anderson*, 857 S.W.2d at 559) (quoting 2A A. Larson, The Law of Workmen's Compensation, § 68.36(d)).  Once Defendant meets its burden of production, the burden shifts back to Plaintiff, who must show Defendant's reasons are a pretext for intentional retaliation.  *Id*.; *Eddins v. Geneva Pharm., Inc.*, 877 F. Supp. 413, 423 (E.D. Tenn. 1994).

There is no dispute as to the first and second elements, (1) Plaintiff was a Buzzi employee when he was injured and (2) filed a workers compensation suit against Buzzi.  Defendant challenges the third and fourth elements.  As to (3), Defendant notes that Plaintiff has not been terminated but is instead on "layoff" (Court File No. 13, p. 8-9; Court File No. 20, p. 3).  First, the Court finds

Buzzi intended to terminate Plaintiff – Buzzi's March 10, 2005 letter confirms this.[12]  In fact, the reason Plaintiff is on layoff is because the arbitrator found Buzzi improperly terminated him (Court File No. 15-4, p. 12-14).  Second, the Court finds the economic effect to be the same.  Plaintiff has suffered an adverse employment action and has lost his position, whether it is defined as "termination" or "layoff."  Therefore, the Court finds Plaintiff has established (3) he was discharged by his employer.

Plaintiff carries the initial burden of showing of a causal relationship between his filing a workers compensation claim and his termination.  *Anderson*, 857 S.W.2d at 558; *Johnson*, 984 S.W.2d at 234; *Eddins*, 877 F. Supp. at 423.  Plaintiff cannot carry his burden by simply showing he filed a workers compensation claim and was terminated, *Morris v. Columbia Constr. Co.*, 109 S.W.3d 314 (Tenn. Ct. App. 2003), nor may he rely on temporal proximity or subjective belief/ speculation, *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) and *Vaughan v. Harvard Indus., Inc.*, 926 F. Supp. 1340, 1350 (W.D. Tenn. 1996), nor may he demonstrate only that a causal connection exists between his injury and his termination.  Rather, to establish his claim, Plaintiff's evidence must connect his *filing a workers compensation claim* to his termination.  *Reed*

---

[12] The letter from Buzzi Unicem USA Inc., dated March 10, 2005, states as follows:
. . .
You were informed, and knew, that there were no positions in the plant that you would qualify for based on the above [lifting restriction].  You were also informed that your lifting restriction did not qualify you for a disability retirement.

It is my understanding you have been paid your vacation for 2005.  At this time, I am notifying you that your termination date is February 28, 2005.  COBRA papers will be sent to you shortly . . .

Sincerely, Deborah A. Bahnick, Director of Employee Relations, cc: George Garcia (Court File No. 15-3, p. 5.)

*v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) (citing *Vaughan*, 926 F. Supp. At 1350).

Here, Plaintiff offers evidence: (1) he was originally released without restriction but Buzzi required him to get a second opinion (Court File No. 15-3, ¶ 6); (2) he believes he could perform the duties of his former position despite his lifting restriction (Court File No. 15-2, p. 6-7); (3) neither he nor the Union were aware of lifting restrictions on his former position (*id*.) ("[t]here was nothing posted anywhere in the plant" defining the jobs); *see also* Court File No. (15-3, p. 7) (Miller Aff., stating "I had never been provided with Buzzi's written job description that had lifting requirements that exceeded Ellis' restriction, although . . . that would be something one would expect the Union to receive"); and (4) Miller, the Union president, was told Plaintiff would be retired and given 20 weeks' back pay if he waived his rights to file a workers compensation claim in Tennessee state court (*id*. at 13). Defendant challenges the admissibility of this last piece of evidence. According to Defendant, this alleged "deal" came up during settlement negotiations and therefore, may not be considered by the Court in determining the validity of Plaintiff's claim (Court File No. 13, p. 9); *see also* Fed. R. Evid. 408; Fed. R. Civ. P. 56(e).

The Court rejects this challenge for two reasons. First, it is not wholly clear this statement was made in the course of settlement negotiations. Though Defendant states "all agree that the same occurred within the context of settlement negotiations," (*id*.), it appears to the Court, when counsel for Defendant attempted to pin Miller into agreeing "that was a part of a settlement negotiation," Miller replied, "Yes. But he had brought it up before that, you know. . . . that if he would sign the waiver." (Court File No. 15-4, p. 4.) It appears there was mention of a workers compensation

waiver prior to any so-called "settlement."[13]

Second, Fed. R. Evid. 408 prohibits the admission into evidence of conduct or statements made in compromise negotiations, if such evidence is to be used to establish the validity of the claim "that was the subject of the compromise, not some other claim." *Uforma/Shelby Bus. Forms v. NLRB*, 111 F.3d 1284, 1294 (6th Cir. 1997) (citing 23 Charles Alan Wright, Fed. Practice & Procedure § 5314) (Rule 408 . . . is inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions . . . unfair labor practice and the like. . . . Rule 408 does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations."). Here, if Plaintiff was attempting to introduce evidence of these "settlement" discussions to demonstrate the validity of his workers compensation claim, the evidence would likely be inadmissible. It is a closer question as to whether these "settlement" discussions are inadmissible in a lawsuit on a different cause of action – retaliation because a workers compensation claim was eventually filed. Because this evidence is being offered for another purpose – to establish Plaintiff's *prima facie* case on another cause of action – this Court will apply *Uforma*'s logic:

> Rule 408 does not exclude evidence of alleged threats to retaliate for protected activity when the statements occurred during negotiations focused on the protected activity and the evidence serves to prove liability either for making, or later acting upon, the threats. *See Vulcan Hart Corp. (St. Louis Div.) v. NLRB*, 718 F.2d 269, 277 (8th Cir. 1983) (Rule 408 did not bar evidence of demand during negotiations to settle grievance that employee resign his union office when General Counsel did not seek to prove validity of grievance).

---

[13] The Sixth Circuit has noted, "it is unclear whether the language in Rule 408 regarding 'compromise negotiations' is broad enough to encompass meetings between company and union representatives who were not lawyers and who were discussing the resolution of a grievance." *Uforma/Shelby Bus. Forms v. NLRB*, 111 F.3d 1284, 1294 n.8 (6th Cir. 1997).

*Id.* at 1294. This Court will consider Plaintiff's evidence; therefore, the burden shifts to Defendant/employer to offer a legitimate, legal, non-discriminatory reason for firing Plaintiff. *Anderson*, 857 S.W.2d at 558-59. As cause, Defendant notes that because of his lifting restriction and seniority, Plaintiff was unable to do his former job or any other job at its Chattanooga facility (Court File No. 13, p. 9; Court File No. 12-2, p. 8-9). As the Tennessee Supreme Court has held, "physical inability to do the job" is a legitimate reason for terminating an at-will employee. *Anderson*, 857 S.W.2d at 559. Thus, the burden shifts back to Plaintiff to prove his filing of a workers compensation claim was a "substantial factor," *id.*, in his discharge.

### 2. **Plaintiff's Burden on Summary Judgment**

Whether Plaintiff may rely on his *prima facie* case or whether he must produce additional, compelling evidence which "overwhelms" Defendant's explanation is still an open question.[14] To show pretext, Plaintiff may present direct or "compelling" circumstantial evidence. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534 (Tenn. 2002); *Reed*, 4 S.W.3d at 685 (citing *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992)). This evidence may include "the employer's knowledge of the compensation claim, . . . failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees . . . or evidence tending to show that the stated reason for discharge was false." *Woodard v. Morgan Tire & Auto, Inc.*, 2006 WL 2850323, * 4 (M.D. Tenn. Oct. 2, 2006) (citing *Newcomb v. Kohler Co.*,

---

[14] *See also Yates v. Hertz Corp.*, 285 F. Supp. 2d 1104, 1120 (M.D. Tenn. 2003) ("courts applying Tennessee law in this area are not entirely consistent . . . [s]ome have asserted that the plaintiff must present specific admissible facts, which realistically challenge the defendant's stated reasons in order to make out pretext. . . . Conclusory statements of the employee do not establish proof of pretext, nor does an employee's subjective interpretation . . . [Other courts] acknowledge that, to establish pretext, the plaintiff must only make out facts that are sufficient to permit, not mandate, the finder of fact to find pretext.") (internal citations omitted).

2006 WL 2535396, *15 (Tenn. Ct. App. Sept. 5, 2006)).

Plaintiff's burden is relatively heavy. Tennessee has long recognized and respected the idea of employment at-will. *Guy*, 762 S.W.2d at 535; *Anderson*, 857 S.W.2d at 559. The baseline question here is whether Plaintiff can prove Defendant retaliated against him for filing a workers compensation claim. *Reed*, 4 S.W.3d at 685. The "bottom line" is *not* that Plaintiff was discharged because of his compensable injury (*see* Court File No. 15, p. 19).

Buzzi's excuse for Plaintiff's termination/layoff is Plaintiff's physical limitations. This is unquestionably a valid reason if non-prextual. The Tennessee Supreme Court has stated repeatedly, if an employer-defendant has a global and neutral policy, i.e. an absenteeism policy, and applies it in a non-discriminatory manner to discharge a plaintiff, no retaliation claim will prevail. *Anderson*, 857 S.W.2d at 559; *Johnson*, 984 S.W.2d at 235-36; *see also Hunter v. Smith & Nephew Richards, Inc.*, 1994 WL 665761, *4 (Tenn. Ct. App. Nov. 29, 1994) (quoting 30 C.J.S. Employer- Employee Relationship § 50 (1992)) ("[a]n employer has a right to establish reasonable standards of physical fitness for its employees, to insure that work is performed by employees who will not endanger themselves . . .or the public at large").

Plaintiff's additional evidence of pretext is that Defendant either instituted job descriptions with lifting requirements after Plaintiff's injury or applied its policy of adhering to job descriptions (though such policy was unknown to Plaintiff and the Union) in a discriminatory manner (Court File No. 15, p. 18; Court File No. 15-2, p. 17-21). Plaintiff offers his testimony and Miller's to show "Buzzi had safety rules that punished employees if they lifted over 50 pounds without assistance" (Court File No. 15, p. 4) (citing Court File No. 15-3, p. 3, 8; Court File No. 15-4, p. 7). Plaintiff's argument is, these job descriptions must be irrelevant or pretextual if Buzzi does not require its

employees to constantly demonstrate they meet the lifting requirements, i.e. to show they can lift 100 pounds (Court File No. 15, p. 7) ("[w]ith respect to Plaintiff's position, although the job description says that an employee must be able to lift and carry up to 100 pounds, Garcia acknowledged that this is not truly a requirement") (citing Court File No. 15-3, p. 19). Notably, though, Plaintiff does not challenge Buzzi's authority to promulgate descriptions for Union jobs. Finally, Plaintiff attempts to demonstrate "Buzzi treated him different than other employees who had lifting restrictions" (Court File No. 15, p. 18) and cites the cases of three employees who apparently had restrictions and yet were accommodated:

> To add insult to injury, Buzzi had other employees with lifting restrictions working in jobs with descriptions that included written lifting requirements that exceeded their restrictions. For example, Johnny Ables had a "no lifting, no climbing" restriction,
> or a 20-pound lifting restriction, yet he was allowed to work in a position in the control room at Buzzi. Earl Masters, another . . . employee with a lifting restriction, was allowed to work in the truck silo as a "buck loader." Further, another employee with a lifting restriction was allowed to work in the storeroom at Buzzi.

(*Id*. at 8) (citing Court File No. 15-2, p. 27-30; Court File No. 15-3). It should be noted that none of these cases are supported by the employees' affidavits; this information is basically hearsay.

Defendant refutes Plaintiff's proof with its own evidence (Court File No. 20-3). Specifically, Defendant offers evidence that the job descriptions were in place some time prior to Plaintiff's injury (Court File No. 12-4, p. 1-2). As to Plaintiff 's allegations regarding the three employees who were supposedly accommodated, Defendant claims the employees were not similarly situated to Plaintiff, and neither Johnny Ables nor the storeroom employee, Vince Kilgore, had lifting restrictions like Plaintiff's (Court File No. 20-3, p. 1-2) (Affidavit of Scott Henniger, Buzzi Production Manager, "responsible for employee safety including the administration of any and all workplace restrictions placed on employees"). Earl Masters had a permanent lifting restriction of 35 pounds in 1999, prior

to promulgation of the job descriptions (*id*.). Moreover, it is worth noting Johnny Ables and Earl Masters each had filed a workers compensation lawsuit in the past (*id*.).

Plaintiff can demonstrate pretext by showing Defendant's allegedly non-discriminatory and non-retaliatory policy was applied in a discriminatory and retaliatory manner. *Johnson*, 984 S.W.2d at 235; *Yates v. Hertz Corp.*, 285 F. Supp. 2d 1104, 1120 (M.D. Tenn. 2003). In *Johnson v. Cargill, Inc.*, the plaintiff was injured at work. A resultant restriction prevented him from performing the same job he performed prior to his injury, though he testified he could perform the job with some assistance in lifting. 984 S.W.2d at 235. The Tennessee Court of Appeals agreed with the trial court that the plaintiff could not do his job without restriction and his employer could terminate him unless it was employing a neutral policy discriminatorily. *Id*. at 235 (citing *Leatherwood v. United Parcel Serv.*, 708 S.W.2d 396 (Tenn. App. 1985)) ("Absent a contractual arrangement, an employer is under no legal duty to provide an alternative position to a disabled employee. . . . If defendant did maintain a light duty policy, then applying it on whether employees filed workers' compensation claims could support plaintiff's case.").

The plaintiff alleged three other cases in which injured workers were accommodated under a "light duty" policy, and argued the defendant conditioned the policy on whether the employee filed a workers compensation claim. However, the court noted, in two of these cases, the employees also filed workers compensation claims. *Id*. Although "[o]ne of the plaintiff's witnesses also testified about accommodation, citing these same individuals and one additional worker[,][h]e did not testify about whether the additional worker filed a claim." *Id*. at 235. The court held, "the record does not contain material evidence to support the claim that the defendant assigned light duty work only if

employees did not file workers' compensation claims. . . . We are constrained to say that the record does not contain material evidence to support the claim that workers who were permanently disabled from performing their jobs were given special accommodations or new assignments." *Id*. at 235-36.

The Court follows Tennessee law and finds *Johnson* controlling in this case. As in *Johnson*, Plaintiff cites an apparently neutral policy – Buzzi's job descriptions – applied in a discriminatory fashion, in retaliation for Plaintiff's workers compensation claim. Plaintiff offers his and Miller's affidavits, so the record reflects allegations that three other employees were permitted to return to their prior jobs or were accommodated with new jobs despite lifting restrictions. Yet these are primarily allegations and hearsay; albeit made in good faith, they are not made from either Plaintiff's or Miller's personal knowledge. To refute such a claim, Defendant offers the first-hand evidence of its Production Manager (Court File No. 20-3). On Defendant's motion for summary judgment, the Court must view the evidence in the light most favorable to Plaintiff. *Matsushita*, 475 U.S. at 587. At the same time, Plaintiff must submit "significant probative evidence" to support his claim and Defendant is entitled to summary judgment if Plaintiff fails to make a satisfactory showing on an essential element of his case. *Celotex*, 477 U.S. at 323-24. Proof of Defendant's retaliatory intent is an essential element, and Plaintiff has not come forth with significant probative evidence.[15] Therefore, summary judgment in favor of Defendant on Plaintiff's retaliatory discharge claim is

---

[15] In addition, Plaintiff alleges Defendant required him to see a second doctor, who imposed lifting restrictions, although his first doctor allowed him to return to work without restriction (Court File 15-3, p. 2). Plaintiff fails to provide an affidavit from Dr. Zellender to support this contention, which renders this contention hearsay. Plaintiff also fails to challenge Defendant's characterization of Dr. Barnett as his "treating physician." Therefore, the Court does not find this allegation raises a genuine issue of material fact.

appropriate. *Accord Bates v. Cooper Indus., Inc.*, 957 F. Supp. 125 (M.D. Tenn. 1997) (plaintiff's proof insufficient to overcome defendant's legitimate, non-prextextual reason for firing plaintiff, which was plaintiff's restriction); *Newman v. Apria Healthcare*, 2006 WL 517637, *6-7 (M.D. Tenn. Mar. 2, 2006) (plaintiff inferred improper motive from management's discussion of plaintiff's workers compensation claim on the day before plaintiff's discharge; court found this to be circumstantial evidence but insufficient to withstand summary judgment); *Vaughn v. Food Lion, LLC*, 2005 WL 1648189, *3-4 (E.D. Tenn. July 8, 2005) ("Tennessee courts have not forced employers to create jobs with accommodations for injured employees unable to work in the same capacity, even if they were injured on the job.").

### D.      INTENTIONAL INFLICTION OF EMOTION DISTRESS

In his complaint, Plaintiff alleges"long-term stress and worry " caused by Buzzi's "desire to prevent and deter other employees from filing for workers compensation" (Court File No. 1-3, ¶ 17).  Plaintiff asserts a claim for intentional infliction of emotional distress ("IIED").

Under Tennessee law, IIED has three elements:

(1)  The conduct complained of must be intentional or reckless;
(2)  The conduct must be so outrageous that it is not tolerated by civilized society; and
(3)  The conduct complained of must result in serious mental injury.

*Bain v. Wells*, 936 S.W.2d 618, 622-23 (Tenn. 1997).  The Tennessee Supreme Court has cited with approval § 46(1) of the Restatement (Second) of Torts, *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270 (Tenn. 1966) and has held that liability for intentional infliction of emotional distress "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities."

> Liability has been found only where the conduct has been so outrageous in character,
> and so extreme in degree, as to go beyond all bounds of decency, and to be regarded
> as atrocious and utterly intolerable in a civilized community.  Generally, the case is

one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Id*. at 274; *see also Bain*, 936 S.W.2d at 623 (collecting cases); *Richardson v. CVS Corp.*, 207 F. Supp. 2d 733, 746 (E.D. Tenn. 2001); *Poteet v. Polk County, Tenn.*, 2007 WL 1138461, *14 (E.D. Tenn. Apr. 16, 2007). In reviewing retaliatory discharge cases, the Court could not find a fact pattern in which another court had upheld an IIED cause of action; in fact, as Defendant notes, "[n]umerous cases have held that conduct far more egregious than anything Plaintiff alleges in the instant lawsuit does not, as a matter of law, constitute 'outrageous conduct.'" (Court File No. 13, p. 11-12) (citing *Jones v. TVA*, 948 F.2d 258 (6th Cir. 1991); *Scarborough v. Brown Group, Inc.*, 972 F. Supp. 1112 (W.D. Tenn. 1997)). Plaintiff argues for the sufficiency of his evidence as to his mental injury,[16] but he does not spend any time arguing that Defendant's conduct was legally outrageous (Court File No. 15, p. 23-24). The Court finds Buzzi's conduct was not "outrageous," especially since it was upheld by an arbitrator and, as the Court found earlier, there was no improper purpose behind Plaintiff's discharge. *Levy v. Franks*, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004) ("[t]he standard for outrageous conduct is high, indeed"); *Woodard v. Morgan Tire & Auto, Inc.*, 2006 WL 2850323, *7 (M.D. Tenn. Oct. 2, 2006).

---

[16] The Court sympathizes with Plaintiff and commends him for his 20 years of service to Buzzi. At the same time, the Court finds Plaintiff's emotional distress does not rise to the level required to show IIED. *Compare* Court File No. 15-2, p. 11) ("[I]t's a feeling that you put all this time with the company . . . you go out in snow, rain, dust and work for them and they just don't care about you at all. They just throw you out. Oh, you got hurt, we don't need you no more.") *with Miller v. Willbanks*, 8 S.W.3d 607, 615 n.4 (Tenn. 1999) ("In proving serious mental injury, a plaintiff must show more than the 'transient and trivial emotional distress [that] is a part of the price of living among people.' Rather, serious mental injury is that in which 'the distress is so severe that no reasonable [person] could be expected to endure it.'").

**IV.     CONCLUSION**

In sum, for the forgoing reasons, Plaintiff has not carried his burden on summary judgment and Defendant's motion for summary judgment (Court File No. 12) will be **GRANTED**.  An order will enter.

/s/_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**